Krillicon versus Silroc Cop. Mr. Emory, may it please the Court, my name is Mark Emory, I'm here on behalf of Silricology and BH. I have a question from the outset. Sure. I have waded through parts of this record, as far as I could go, to try to determine whether there's a contractual relationship between the parties, there's a lot of arrangements between all kinds of parties in this litigation, antecedent parties, all kinds. There are no contracts that I could find that would spell out the terms, to say what the parties' responsibilities are. There's a lot of arguments about in Germany, and I suppose German law covers all that, but at any rate, there's nothing about contractual relationships and terms, except we had a deal with here and we have a deal with there, so I tell you, that to me is a problem. I agree, Your Honor. Especially if you're having it, the formula or whatever it is, transferred around, that surely requires some kind of contractual terms. So you don't know, for example, you don't know whether they sold the formula or whether they kept the formula, if they sold it and then it got it back, I'm talking about your client, got it back so they could manufacture the resins, and kind of held the formula in trust, so you've got a trust relationship. I just don't know. Your Honor, as a general proposition, I would agree that a lot of these matters are not clear, what the contractual relationship is, and I hope that I'll be able to cover that here. How did the plaintiff acquire the resin? Did it send a purchase order to somebody? No, it didn't. I'm sorry, was your question as to the acquisition of the resin? That's one. How do they acquire the resin, 1061 SW? They got a standing contract for a lot of small contracts or just a purchase order? What is it? My client, Silicol, developed the 1061 resin, and it has always possessed that resin. I understand, but did you sell it? Right. There was the GSA, the Global Settlement Agreement, entered into in 2010. Both of the parties here were parties to that agreement. There is, I think, a dispute about what rights were transferred in that. That's very vague. Right. But my understanding is that they were entitled to receive the resin. As a result of paragraph 5 of the GSA, the formula for the resin was sent to Mr. Hegstad, who is an entirely different individual and not the plaintiff here. Forget the formula. Did your client send the resin to the plaintiff? Our client has produced the resin for years. From whom do they buy it, and how? Silicol manufactures the resin until 2015, and Acrylicon buys it. But how do they buy it? Do they send a purchase order, or is there a longstanding agreement between the parties? There is an Acrylicon entity, that's my understanding, that I think is called Acrylicon Distribution, that sends purchase orders to Silicol for the resin. Not the plaintiff? Some other Acrylicon entity? That's correct. That's correct. What is the relationship between that entity and the plaintiff? The plaintiff in this case is a very small Georgia company that is solely a distributor. I can't tell whether they're a subsidiary of International or what. As far as I know, they're entirely independent and they only have distribution rights. Are you telling us the record doesn't tell us any of these things? I'm telling you that what I'm sure of is that the plaintiff in this case does not possess the resin formula. Whether some other Acrylicon entity might, I mean, it was sent to Mr. Hickstead. If they possess the formula, it would be because of some contractual relationship. Would you agree with that? Either whoever had the formula, wait a minute, whoever had the formula voluntarily gave it to them, or they acquired it by contract. Is there any other way they could get it? The only way that I'm aware that the trade secret went from Silicol to anybody else would be when the formula was mailed to Mr. Hickstead. Well, that would be by some kind of an agreement. Yeah, and that agreement was made in paragraph five of the Global Settlement Agreement. You're telling me that that is it? That's it as far as I know.  No, Your Honor. Okay. If I could, I'd like to jump, there are two issues. I'm going to take up your time. I appreciate it. There are two issues I would like to really make sure that I cover today. The first is the misappropriation statute, the second is the punitive damages, and if time permits, personal jurisdiction. Well, I have one last word. I speak for myself. Rights and liabilities evolve from contractual arrangements. I agree. I agree with that. I don't know where everyone is. Okay. With respect to the misappropriation statute, there are two important points I'd like to make this morning. First of all is that Georgia wrote its misappropriation statute in a very specific way. If you look at page 29 of our opening brief, we outlined the statute and highlighted that each subpoint of the statute requires that there either be an acquisition of a trade secret of another or some derivation of a trade secret of another by the person that's misappropriating. As we said multiple times below, the statute just doesn't fit the facts of this case. In every case, the classic scenario for the particular provision that Acrylicon relies for here is what was found in this court's precedent in the allegations, at least in penalty kick versus Coca-Cola, where somebody with a trade secret gives it to Coca-Cola under a disclosure agreement, Coca-Cola then arguably does something with it. I agree that it looks like that. It's a sound argument, but how would they have acquired the trade secret? They didn't have it to start with, so they had to buy it. Either that or somebody voluntarily gave it to them. Or they got it through the Global Settlement Agreement, right? Is that how they got it? I know that the Global Settlement Agreement says that it was sent to a burnt Eichstatt, but the evidence in the case that came out at trial is- That Global Settlement Agreement is just, I speak for myself, you can throw it out. It said some things you can't do. You're saying that individual was not related to Acrylicon USA LLC? At one point in time, he was a principal, but he no longer is. How about at the time of the agreement, the Global Settlement Agreement? I believe he was at that time, yes. Is that the link then? No, it's not the link. Because the formula itself was sent to him, the evidence, this was all put on at trial. There are really only two working persons in Acrylicon USA in the US, Don Bai and Jason Bai. They were both asked expressly what they know about the formula. Don Bai says she knows nothing about it. She's never seen it before. And Jason Bai said, at one point- We understand all that. When it was sent to him, there must have been something in writing. That doesn't mean, sent to him doesn't mean anything. It means entrustment. Right, I'm aware- Your client had the formula. Is that not, that's my understanding. As far as that, it was sent by mail to him. Whatever, your client had the formula. My client always had the formula. It delivered it to somebody, so that's a bailment. Under American law, that would be a bailment, unless there's some agreement that entrusted it to him. Did you follow? I think so, Your Honor, but I- All right, otherwise it just, I sent you my car, so I just sent you something. Right, in particular- It's either a gift or it's a bailment or it's an entrustment. What I would say- Is there anything else? In particular, what we're talking about here is whether it's a trade secret, right? What makes it a trade secret is that my client has always known the formula and my client has- I'm sure your client's known the formula, and the question is whether he sold it to somebody. No, he didn't sell it to anybody. Did he entrust it to somebody? He sent it to somebody, so there was an entrustment. It was sent to him as one term of the Global Settlement Agreement. However, we've continued- There's nothing in the World Settlement Agreement at all that describes how, what the legal consequences were of the entrustment, of the delivery. Zero. He was able to do anything with that formula once he received it? Put aside the connection to Acrylicon. That gentleman was able to do anything he wished with that formula once he received it, pursuant to the terms of the Global Settlement Agreement? He could have sold it on the open market. He could have burned it. He could have made the resin himself if he had the capacity. No, I think it wouldn't be- What would prevent him from- If he had done that, it wouldn't be a trade secret anymore. No, no, forget trade secret. It's a piece of property. The formula is a piece of property. And it went to this gentleman. It had to go to him under some legal construct. But there's just nothing in the record, whatever, as I see it, that explains anything. Because the terms under which something is sent to somebody creates liability, terms of liability. This happened in Germany. Yes, I mean, our client continues to possess the trade secret. Until 2015, we continue to manufacture it for Acrylicon. You stopped it. You gave it to somebody. What happened in 2015? Forget the settlement. There's, I think, there's probably a lot to happen. I'm not sure it's all in this record. Do your clients still make the, as far as we know, still produce it? No, they don't. They've, I believe, ceased to produce the resin as of 2014 or 2015. Is somebody else producing it? According to the record. I'm not sure the record clarifies that. I think there's reason to believe it is still produced, but I won't get into that. Was, I know we're deviating from what you want to talk to us about, but we're trying to get a handle on just the underlying nucleus of facts that leads to all of the arguments that both sides are making here. I think some of us are having some trouble figuring all of that out in this complicated record. One of the things that popped into my head was whether or not the sending of the formula to this gentleman might have been akin to some sort of licensing, sort of analogizing to patent law where the patent owner and holder continues to have all rights, but licenses the product or the intellectual property to someone else for a period of time for a fee. And that would be an agreement, a written agreement. Yeah, there's no... I don't think there's any such a licensing agreement like that. So on the trade secret, then your argument, I thought it was relatively simple. Once you got down to it, your argument is under Georgia trade secrets law, my client developed a formula, owned a formula, never gave up rights to the formula, although it might've shared it with somebody else. And whatever else may have happened, my client can't be held liable for infringing the trade secrets of a product that it developed and owned. That's essentially the argument, right? You can't violate trade secret law with regard to your own secret, is essentially your argument, right? Yes, that's right. That's right, Your Honor. It was our trade secret. It's always remained our trade secret. And this statute is just simply ill fit for what the allegations are. Your position is that whatever else may have happened, whatever other theory of liability might've been asserted with regard to what happened, trade secret could not have been it because it was your trade secret and never ceased to be your trade secret. That's correct, Your Honor. The one thing I would say is that... It's not secret if a bunch of people own it. If a bunch of people, that's common sense. If a bunch of people don't know what the secret is, it's... Right, right. And I do think that there's one distinction to be made with respect to patent law, that in patent law, it's different from a trade secret because everything is public about it, right? So you can't actually sell and transfer... No, no, I was only talking about the transmission and you've told me there wasn't anything like that, so it's not a good analogy. Okay. All right, I see that my time is up. You've reserved some rebuttal time. Thank you, Your Honor. Mr. Kaplan. Thank you, Mr. Court. Maybe you can answer the question, are there any agreements in writing put aside the settlements in this record that indicates any relationship amongst any of all these entities? Yeah, there is a license agreement in place between the Acrylicon entities that historically had developed and held the trade secret rights and Acrylicon USA, the plaintiff in the case. Where is that in the record? That is Plaintiff's Exhibit 13. Exclusive license agreement. And in paragraph... Well, that's between... The Acrylicon, on the Acrylicon side. Right, and not including Silicone. Silicone. Silicone is not a party to the license agreement. I understand that. I want to know, make an assumption for sake of discussion. Silicone started the whole thing with the resident. Look, assume hypothetically, and then it somehow gave it away. I'm looking for the agreement. I have two answers to that question. Is there a written one? There is a written one. Where is that? It's the Global Settlement Agreement. Well, assuming that's not, for my purposes, not the agreement. Where is the agreement between, that goes way back? Yeah. Between International and Silicone. Let me go way back for a second. Right, because we're reviewing the evidence in the record. I understand. Including the agreements. That's what I'm looking for, what's in the record. All right, so the uncontradicted testimony from Bjorn Hegstad in the trial record, pages 121 through 124, is that he developed the idea of this resident. He went to Silicol just to have them manufacture it. And from the outset, Silicol acquired the formula under circumstance that gave rise to a duty to keep it secret. And Mr. Hegstad testifies in no uncertain terms that from the outset, there was an understanding, an agreement, that it was exclusively Acrylicon's resin. And beyond that, Acrylicon owned the formula, 1061 SW. That's the root of this. So. And where is that in writing? That's, it's oral testimony, evidence in the record. All right. Now it's confirmed as well throughout the relationship. So just to confirm, there are no, and it doesn't mean that we can't accept a testimony, but we should not hunt through this record for a document which spells out what Mr. Hegstad testified to. No, beyond a set of letters confirming the understanding.  It's exhibit, plaintiff's exhibit 25, 26, and 27, where Silicol repeatedly throughout the history of this relationship that extended for many years. It misappropriated it from the beginning, is your argument? No, because we. Wait a minute, wait a minute. Hegstad invented it. Went to Silicon and they made some. But it was his property and he's acting for Acrylicon. Okay. But. Silicon wound up with the formula. Yes. Okay. And to the extent they might use it to make anything, they're misappropriating it. Unless it's with our consent. Unless it was with Acrylicon's consent. Unless it was a written agreement. Judge, respectfully, the trade secret rights do not have to derive from a written agreement. The state. I understand that. But what somebody does with something is covered by the law. Correct. Which usually is agreements. There's some kind. There's an entrustment or a bailment or there's something. Right, and there is. But I just want to emphasize, as these letters confirm, Silicol was permitted by Acrylicon to manufacture the resin exclusively for Acrylicon. That's what the evidence in the record, which is not only legally sufficient, it's unrebutted, confirms. Now let me turn to the global settlement. But wait, one question. So if we look at 25, 26, and 27, we'll find that. We'll keep it secret while we manufacture this. Yeah, and it's for Acrylicon's exclusive use. That's what the language of those letters. Well, then you're talking about an entrustment. That's what the trade secret is.  No, no, no. There was a legal relationship between Acrylicon and Silicol. Yes. And they gave it to them under like a trust agreement. Exactly. We own it. You use it for this purpose only. Exactly. But that has legal consequences. Exactly. Yes, it does. That's what I'm looking for. It is something that tells me. That's it. Other than other than a swearing match. It's not a swearing match because there's nobody saying anything different. All right. What, what, what? You're telling me that there's no testimony whatsoever. And I know we have to view the evidence in the light most favorable to the jury verdict. But you're telling me that there's no testimony in the record whatsoever on Silicol's side that it developed the formula. There's no testimony they cite to is from the summary judgment record. We're just asking you whether or not there's testimony at trial. Not at trial. That they developed the formula. Not at trial. Okay. Not at all. Nobody, nobody said this formula is ours. Somebody in our company developed it. Nothing like that. That's the reality here is they did not call a witness. Right. That's, I mean, at bottom, this is a case of waiver. No, no admissions by pleading or by stipulation or by anything else. Not in this record. What's in their brief? It just meant a whole clause. They cite to a complaint in another case that was never admitted into evidence. They objected to it. Defendants exhibit 50 and they mischaracterize it. They cite two declarations that were filed as part of the summary judgment record that never made it into the trial record. The evidence here is Mr. Hagstad's testimony confirmed by those historical letters and also the testimony of the buys that Acrylicon owns the trade secret. That's the bottom line here. Ownership by Acrylicon of the trade secret. And the global settlement agreement, your honors characterized it. I respect that. But first of all, Acilicol admits that that agreement was in effect and they were bound by it. I understand. Some lawyers got together. They drew the agreement. And if I were the judge, I'd burn it. I wouldn't approve it. The agreement is binding between the parties. I assume the court reserved jurisdiction to enforce it. No, that's why we filed a new suit in the same court. But just procedurally too.  Which was affirmed on appeal already in this case. Permanent injunction. That's the law of the case here. It recognizes that the global settlement agreement is not only valid, but enforceable. And it imposed upon Acilicol. But that injunction is preliminary. I mean, it binds in certain ways. It's not, respectfully, it's not a preliminary injunction. It's a permanent injunction. It was appealed. A permanent injunction went on interlocutory appeal. It was a permanent injunction before the jury verdict? Correct. Based on what? Summary judgment. It's a summary judgment order granting permanent injunction. If it was a permanent injunction, the panel should have entertained the jurisdictional question. Panel error. No, here's the issue with that, Judge. Acilicol, we can see, had the right to appeal the summary judgment order, which necessarily included a finding of jurisdiction. But they didn't appeal that issue. But the panel recognized it. We won't reach it. The Acilicol only tried to appeal the motion to dismiss denying dismissal based on jurisdiction. That's not appealable. It's appealable. It's appealable within a final judgment. Right. Well, if a permanent injunction is a final judgment. That's right. They could have appealed the issue directly as part of the final permanent injunction, but they did not. All right. And that's a fundamental waiver point here. But then there would have been two final judgments in this case, which goes against the notion of piecemeal appeals. Because then you would have had a final appeal, as you say, from the permanent injunction issued at summary judgment. But you weren't satisfied just with that because you wanted monetary relief. So then you had to go to trial. Correct. Then there'd be a second appeal and you'd have all sorts of collateral estoppel issues. I think, first of all, it was their strategic decision to appeal interlocutory that could have waited. And there are collateral estoppel effects here based on the permanent injunction, the summary judgment order that was upheld on appeal. It decides jurisdiction. It decides validity of the global settlement agreement. And it decides breach. I may have spoken a little bit too loosely. Maybe not collateral estoppel, but law of the case. Exactly. That applies here. That's our waiver argument on the jurisdiction issue. They could have appealed jurisdiction directly to the extent it was necessarily a piece of the summary judgment order, but they did not. And they don't get two bites at the appellate apple. They never even addressed the summary judgment record on jurisdiction. They focused only on the motion to dismiss. But I want to make sure we emphasize the global settlement. But there are certainly appellate issues, whatever they may be and however limited they may be, that can arise from the jury verdict. That were not foreclosed by the initial appeal. That's right. It's the amount of damages that were awarded and the trade secret claim. And anything that happened in the trial, evidentiary issues, jury instruction issues, things like that. That's right. Absolutely. But not only was jurisdiction decided by virtue of their not appealing it in connection with the summary judgment order. There was nothing in the brief about jurisdiction on the prior appeal? Absolutely. Why did the court's opinion mention it? Because they only raised the issue as a request for pendant jurisdiction over the denial of the motion to dismiss. And the first... Well, pending jurisdiction implied that there was no final judgment. No. If there was a final judgment, you don't have... You don't need pending jurisdiction. You don't need ancillary jurisdiction. I agree. But they framed the appeal. But what I'm saying is our court treated it as an ancillary matter and went into the intertwined issue. The court, as an appellate court's obligated to do, addressed the issues as they were raised. Well, we also could make mistakes the way we write opinions. I don't think respectfully there was a mistake at all because Silico framed the issue only as an appeal of the denial of the motion to dismiss, which isn't appealable. I think we beat that horse to death. So again, I just want to focus on the global settlement agreement, Judge. I know I respect your characterization, but the terms of the global settlement agreement are very specific. And paragraph five makes clear that Silico, to the extent it still is going to manufacture this formula at all for Acrylicon, it's got a duty to keep it exclusive and secret, hold it in trust and in confidence, not only under the contract, but as a trade secret. Do two parties still do business? No. Acrylicon's got its own manufacturing facility now where it uses and keeps and holds and owns the formula. And what were the breaches of the trade secrets law that it sold it to other? Absolutely. People? For years before the global settlement agreement was entered into and after. Well, before, if the settlement agreement is really global, the before doesn't really matter. It does because in the agreement, Silico expressly represented and warranted that it had not sold the formula to anyone other than Acrylicon. What court held that prior to this whole thing, going back when Silico and Acrylicon got together with this arrangement, that there was a breach? No, no. Your argument was that way back at the beginning, they stole or appropriated the trade secret that belonged to the antecedent of your client. Well. That's what you've just said. Yeah. They've been doing that long, long before your client was ever invented. Correct. Okay. That's why I ask questions. Agreed. About contractual relationships, which are extremely important. Otherwise, you just have people talking. And they're voicing legal conclusions, which don't have any probative effect at all. The testimony. So it seems to be the only argument you've got about those legal conclusions is they don't dispute them. They're not disputed, of course. But beyond that, it's factual statements about the relationship. The relationship was, I, Mr. Haigstad from Acrylicon. I understand that. But the terms under which something was communicated to somebody else or legal terms are extremely important because they give rise to duties. But that's what the testimony was. The testimony was Silico agreed that it was going to be exclusive for Acrylicon. That's not necessarily a legal conclusion. That's an understanding about the relationship. And that's what the Global Settlement Agreement confirms. And that's the representation that was breached, which is at the core of this case, that they had not previously used it for anybody else consistent with their obligation and the representations in the agreement. And that was false. Thank you, Your Honor. Mr. Emery. Before you start, Mr. Kaplan says that there is no evidence presented by you at trial that contradicts Mr. Haigstad's testimony that he developed the formula and then worked with Silicol to develop it. He says he developed it on behalf of Acrylicon. He says that all the evidence that you cite in your brief comes from the summary judgment record, response to the complaint, other parts of the record that predate the trial, and that at trial, the evidence was one-sided as to who came up with this formula. And that was Mr. Haigstad. What's your response? There would be a couple of things. One is the Global Settlement is in agreement, or sorry, is in evidence. And paragraph five of it, as we've discussed already, says that they're going to send the formula to Haigstad. Why would they need to do that if he developed the formula back in the 1970s? It just doesn't make any sense. Why would there need to be a settlement agreement if there were no disputes about anything? There were obviously problems, right? Or else there wouldn't have been an agreement to resolve those problems, however deficient the agreement may have been. So did anybody testify on behalf of Silicol at trial? Or did you obtain any adverse testimony at trial that somebody at Silicol developed the formula? At trial, actually, some of the clearest evidence that Silicol was the possessor of the formula came from... Not the possessor. They possess it as an entrustment. That's why I asked all those questions to start with. They can possess it because it was theirs. They developed it. They could possess it because they had a contractual relationship with Quilico and they sent it to them under some kind of terms. They could possess it as a bailee with almost no contractual relationships, but under the German law of bailment, some kind of responsibility. Your Honor, I think the best answer I can give to that is that there is no agreement that spells out any sort of bailee relationship, anything like that. The evidence that Quilico had the formula. Absolutely. And Dawn Bayh said that... I was looking for the specific site, but they said that she was asked, what did you think you got in the global settlement agreement? She said she thought we got the rights, the exclusive rights to the resident. At that point. But did you give the resident a different number, though? No. The 1061 resident is a distinctive product and that's always been what it is. You may be thinking there's allegations that there was a different silico product in which the resident was substituted for the silico product, yes. But the resident has always been a singular formula and a trade secret formula of silico. If she testified, you said it was Dawn Bayh who testified to this. If she testified that she believed that they got the exclusive rights pursuant to the global settlement agreement, what does that say about who developed the formula to begin with? It doesn't say anything about it. Because they... So then there's no testimony contradicting Mr. Hestag's version of events, which is he developed it and then he went to Silicol to develop it. But what does that mean? He went to Silicol to develop it? I have no idea what it means. It doesn't mean that he knew or possessed the formula because if he did, there'd be no reason to send it to him. But all of that is bound up in legal relationships. It seems to me that this case has got approached on facts by laypeople who said, I did this and I went here and I went there. And not a whiff, as far as I'm concerned, of anything that explains the legal relationships of these, quote, activities. I think I agree. I went to Kilgall Plant and they had a formula and they fixed it up. What does that mean? Doesn't mean anything to me. What's the legal circumstances? Did he give it to them? Did he share it with them? I agree. And I think it was Acrylicon's burden to prove all of these things at trial. Well, now, Mr. Kaplan says the evidence is notwithstanding the lack of any kind of legal explanations, that it's undisputed. No, it's not undisputed. I mean, I told you, the agreement itself is an evidence and the testimony was that they thought that they were obtaining some kind of rights. I mean, Acrylicon is a distributor. The plaintiff in this case does nothing except distribute the resin. There's no reason for them to know the formula, no reason for them to possess the formula. They've never manufactured the formula. There's no evidence as to any of these things. Who blew up the stream going back in time, supposedly has it? International? As far as we know. Acrylicon, well, that's why he was involved with International. That was the first big company, wasn't it? I think what the record says is that at some point it was sent to Hegstad. But I don't know of any legal agreement by which Acrylicon has the formula. Which Acrylicol company was involved way back then? I don't know. The record doesn't tell us? No, no. The testimony that Mr. Kaplan said doesn't clarify that. Does the record tell us anything about the contractor relationships in terms of documents? No. I mean, any of the Acrylicol companies, I expect there are several. The record tells us there are several, doesn't it? I don't think. Well, they're in a settlement agreement named Sui, at least. I don't think the record establishes any chain of ownership, of Acrylicon's ownership of this 1061 resin. So they... All we know is according to what you're saying is that the plaintiff manufactures or has it manufactured. Is that it? Until 2015, Silicol manufactured it for Acrylicon. Silicol did? Silicol manufactured and sent... Where'd they send the resin? Silicol would send their resin to various distributors. Did they send it to the plaintiff? Yes. Okay. To whoever in the Acrylicol chain of events wanted it. Is that it? Yes, Your Honor. Okay. There's one last issue. I realized my time. One last issue you'd allow me to hit on personal jurisdiction. And there is the suggestion here that we somehow didn't appeal from the summary judgment order. But I think document 242 in the record is our notice of appeal. Our briefs in that appeal tell us that. It's all a matter of record. Okay, I agree. I think it's clearly established on the court's opinion that we raised the issue. Thank you, gentlemen. We'll be in recess until nine in the morning. Move. Okay.